No. 3–07–0404

Filed January 8, 2009 **Correction**

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2008

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 06-CF-851 |
| RAYMOND JOHNSON, | ) ) | Honorable Stuart P. Borden, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE CARTER delivered the opinion of the court:

After a stipulated bench trial, defendant was found guilty of aggravated battery with a firearm (720 ILCS 5/12–4.2(a)(1) (West 2006)), aggravated unlawful use of a weapon (720 ILCS 5/24–1.6(a)(1) (West 2006)), and unlawful possession of a weapon by a felon (720 ILCS 5/24–1.1(a) (West 2006)) and was sentenced to concurrent terms of imprisonment of 12 years, 7 years, and 7 years, respectively. Defendant appeals his convictions, arguing that the trial court erred in denying his pretrial motion to suppress a gun that was recovered from a third party's vehicle and his pretrial motion to suppress his statements to police. Defendant also argues that his conviction for aggravated unlawful use of a weapon must be vacated under one-act, one-crime principles. We affirm the trial court's denial of defendant's motion to suppress the gun and defendant's motion to suppress his statements to police. We vacate defendant's conviction and sentence for unlawful possession of a weapon by a felon and remand this case to the trial court to amend the sentencing order accordingly.

FACTS

Defendant was charged with the above-listed offenses in connection with the July 9, 2006, shooting of Calvin Powell in Peoria, Illinois. Count I of the indictment alleged that on or about July 9, 2006, defendant committed the offense of aggravated battery with a firearm (720 ILCS 5/12–4.2(a)(1) (West 2006)), a Class X felony, in that in committing a battery, he knowingly and without legal justification caused an injury to Calvin Powell by means of the discharging of a firearm in that he shot Calvin Powell with a handgun. Count II alleged that on that same date, defendant committed the offense of aggravated unlawful use of a weapon (720 ILCS 5/24–1.6(a)(1) (West 2006)), a Class 2 felony, in that defendant knowingly carried on or about his person and immediately accessible to him an uncased loaded handgun at a time when he was not on his own land or in his own abode or fixed place of business and defendant had been previously convicted of a felony in this state. Count III alleged that on that same date, defendant committed the offense of unlawful possession of a weapon by a felon (720 ILCS 5/24–1.1(a) (West 2006)), a Class 3 felony, in that defendant knowingly possessed on or about his person a firearm having been previously convicted of a felony under the laws of this state or any other jurisdiction.

During the pretrial stage of this case, defendant filed a motion to quash arrest and suppress evidence (the motion to suppress the gun). In the motion, defendant alleged that he had been subjected to an illegal seizure in violation of the United States and Illinois Constitutions. Defendant sought suppression of all physical evidence and statements that were recovered as a result of the alleged illegal seizure. Although the motion did not articulate the items that defendant sought to have suppressed with any specificity, it appears from the record that with the first motion to suppress, defendant was primarily seeking to suppress as evidence a gun that was recovered from under the

2

passenger seat of a vehicle belonging to a third party, Lawrence Thomas.

A hearing was held on the motion to suppress the gun. At the hearing, defendant called Peoria police officer Chris Hanley to the witness stand. Hanley testified that on July 9, 2006, at about 3 or 3:30 a.m., he responded to a report of a shooting on Jefferson Street in Peoria. Hanley was about six blocks away at the time and was on patrol in a marked police squad car. Upon approaching that address, Hanley saw two male subjects get into a vehicle parked in the parking lot of the Friendship House in an area near where the shooting took place. The Friendship House was not open for business at that time. As the vehicle left the parking lot, Hanley followed the vehicle, without activating his squad car's overhead lights. Hanley did not see the vehicle commit any traffic violations and the vehicle did not attempt to flee. After a couple of blocks, the vehicle pulled into the Taft Homes and parked in a parking spot. Hanley parked his squad car and illuminated the vehicle with his spotlight. Hanley did not activate his overhead lights and did not block the vehicle into the parking lot with his squad car. The driver and a passenger got out of the vehicle. Defendant was the passenger. Lawrence Thomas was the driver.

Hanley got out of his vehicle and approached defendant and Thomas. He did not draw his gun. Hanley asked defendant and Thomas if they knew anything about the shooting. Defendant and Thomas seemed nervous and did not say much to Hanley. Hanley asked defendant and Thomas what they were doing in the area. Thomas responded that he worked for Caterpillar and that he did not get involved in criminal activity. Defendant stated that they were visiting somebody in the area but did not go into specifics of who they were visiting or where. Defendant and Thomas did not ask if they were free to leave, and Hanley testified that the two men were not free to leave at that point.

Officer Buhl, Officer Goforth, and Lieutenant Adams arrived at Hanley's location. Upon

being asked, defendant and Thomas consented to a search of their persons. Hanley testified that defendant and Thomas seemed very nervous about the whole thing. Nothing illegal was found on Thomas or defendant's person.

Hanley asked defendant and Thomas for identification. After receiving the identification, Hanley ran a warrant check on each subject, with negative results. Hanley could not remember whether he returned the identification cards to either subject at that time. Hanley asked Thomas for permission to search the vehicle. Thomas, who was the driver and the owner of the vehicle, refused. Lieutenant Adams instructed Hanley to detain the two subjects, secure them in the back of a squad car, and to search the vehicle anyway. The officers did not obtain a warrant for a search of the vehicle. Hanley secured defendant and Thomas. He could not remember whether defendant and Thomas were handcuffed while in the back of the squad car. Upon conducting a search, Hanley found a .22-caliber handgun under the front passenger seat of the vehicle.

During the encounter, defendant and Thomas complied with the orders they were given by the police officers and did not try to flee. Neither subject ever asked if he was free to leave, and Hanley never told either subject that he was free to leave. After the gun was found, defendant and Thomas were taken to the police station for interrogation.

Following Hanley's testimony, defendant rested. The State called Peoria police lieutenant Jeff Adams to the stand. Adams testified that on July 9, 2006, at about 3:13 a.m., he was on patrol near the north end of Peoria when he heard a call come over the radio about a shooting that had occurred at 817 North Jefferson. Adams was just around the corner from where the shooting took place, so he went to the scene. In driving to the scene, Adams did not see anyone else out in the area.

Adams got out of his car and knocked on the front door of the house at that address. Officer

4

Landwehr joined him at that time. A woman opened the door. When the officers stepped inside, they saw a man lying on the floor in a pool of blood. The woman told Adams that she had just heard some gunshots behind the house and that the man ran into the front door of the house stating that he had been shot.

Adams left Landwehr at that location to tend to the shooting victim and went outside, where he was joined by Sergeant Venzon and a couple of other officers. Adams told the other officers to go behind the house and to look for the location of the crime scene so that it could be secured and physical evidence could be gathered. Adams told Venzon to go inside with Landwehr to try to get information on who the possible suspects were so that they could put that information out over the radio.

Within two minutes after he had arrived at the scene, Adams heard on the radio that Officer Hanley was following a vehicle that had just left from the Friendship House. The Friendship House was about one or two houses down from where the shooting occurred. Adams left the scene of the shooting and went to back up officer Hanley. Other than the police officers that Adams mentioned, no one else was out at that time. The businesses in the area all were closed. When Adams got to Hanley's location, the vehicle that Hanley was following had already stopped. Hanley had illuminated the vehicle with his spotlight and was talking to two gentlemen outside of the vehicle. Hanley told Adams that the two gentlemen had agreed to have their persons searched but were refusing to have the vehicle searched. Despite that refusal, Adams directed Hanley to search the vehicle. Adams felt that there was probable cause to search the area within the vehicle that the two gentlemen had direct access to based on what Officer Hanley had told him and because the vehicle was leaving from the area where the shooting had occurred within a short time later and at a time of night when no one else

5

was out. At the time that he gave the direction to search the vehicle, Adams knew that defendant's and Thomas's identification had been verified, that there were no warrants out for either of them, that they had agreed to a search of their persons and nothing illegal was found, and that Thomas had refused a police request for permission to search the vehicle.

All of the officers at defendant's location were in uniform and had arrived at that location in marked squad cars. None of the officers had their guns drawn. Adams had the two subjects put in handcuffs and secured in the back of a police squad car so that Officer Buhl could watch the two subjects while Hanley was searching the vehicle.

Adams left the area as Hanley was searching the vehicle. Adams heard over the radio that a gun had been found in the passenger section of the vehicle. Adams acknowledged that there was an assistant State's Attorney and a judge available if the police officers wanted to try to get a search warrant to search the vehicle. The officers did not attempt to get a search warrant because Adams believed that they had probable cause to search the vehicle as an exception to the search warrant rule. Adams acknowledged that it was not odd for someone to be out in the Taft Homes at 3:30 in the morning. Prior to the search of the vehicle, Adams did not inform the two subjects that they were being detained. Adams felt that the officers had sufficient grounds to detain the two subjects because the two subjects had been seen in the immediate area of where the shooting had occurred and were the only individuals out in that area at the time. Adams felt that they could detain the subjects to determine if they were suspects, victims, or witnesses to the shooting.

After Adams testified, no additional evidence was presented. Defendant argued that he was subjected to an illegal seizure and that any evidence that was recovered after that seizure should be suppressed. The State argued that defendant lacked standing to contest a search of Thomas's vehicle.

Alternatively, the State asserted that the encounter started as a voluntary one, that defendant was reasonably detained, and that the officers had probable cause to search Thomas's vehicle. After hearing the initial arguments, the trial judge noted that he did not believe that there was sufficient probable cause to justify a search of the vehicle. The trial judge took the matter under advisement to consider further the issue of standing.

The case was continued to another date for further hearing on the matter. The parties were given an opportunity to present case law and additional arguments on the issue of standing. After hearing the additional arguments of the parties, the trial judge denied the motion to suppress the gun, finding that defendant lacked standing to challenge a search of Thomas's vehicle. In announcing his ruling, the trial judge noted that he would have granted a motion to quash and suppress as to the search of the vehicle if it had been brought by Thomas, rather than defendant.

Defendant subsequently filed a motion to suppress his statements to police. A hearing was held on the motion. At the hearing, the parties asked the trial judge to consider the evidence that was presented at the previous hearing on the motion to suppress the gun. No additional evidence was presented. In his argument, defense counsel represented that after the gun was found in the vehicle, defendant was taken to the police station and interrogated. Although in the written motion defense counsel alleged that defendant's statements to police were involuntary, defense counsel did not raise that argument in his oral comments to the trial court. Rather, defense counsel reiterated the argument that he had made to the trial court on the motion to suppress the gun. Defense counsel asserted that after the police learned defendant's identity, his purpose for being in the area, and that he had no outstanding warrants, the stop should have been over and defendant should have been allowed to leave. Defense counsel asserted further that the detention of defendant beyond that point was an

7

illegal seizure and that the subsequent interrogation of defendant was the result of that illegal seizure and should be suppressed.

After considering the arguments of the parties, the trial judge found that once the officers discovered the gun in Thomas's vehicle, through a search which defendant had no legal ability to contest, the officers had probable cause to arrest defendant. The trial judge ruled that the continued detention of defendant was proper and denied defendant's motion to suppress statements.

After the motions had been resolved, the case proceeded to trial. Defendant waived his right to a jury trial and the parties proceeded by way of a stipulated bench trial. Of importance to this appeal, as part of the stipulation, it was represented to the trial judge that defendant, after being taken to the police station, waived his rights and gave an oral and videotaped statement. In that statement, defendant admitted that he had shot the victim and said that he did so because the victim flinched or made a move toward his waist and defendant feared that the victim may have had a gun or a knife. Defendant stated in his statement that he was only trying to shoot in the air to frighten the victim away. Lab testing that was conducted on four spent casings found at the scene of the shooting indicated that the casings were all fired from the gun found in Thomas's vehicle. The victim did not have a good recollection of the incident but remembered being approached by a black male subject in the alley, trying to run away, and being shot in the back. The victim spent over a month in the hospital and had several surgeries to repair the damage done to his internal organs. Additional evidence was presented that defendant had previously been convicted of the felony offense of unlawful possession of a controlled substance.

At the conclusion of the stipulated bench trial, defendant was found guilty of all three offenses. The parties agreed to a sentencing cap of 18 years in the Department of Corrections as to

8

count I of the indictment. Following a sentencing hearing, defendant was sentenced to a term of 12 years' imprisonment for aggravated battery with a firearm and two terms of 7 years' imprisonment for aggravated unlawful use of a weapon and unlawful possession of a weapon by a felon, all of the sentences to run concurrently. Defendant filed a motion to reconsider sentence, which was subsequently denied. This appeal followed.

ANALYSIS

On appeal, defendant argues first that the trial court erred in denying his motion to suppress the gun and his motion to suppress his statements to police. Defendant does not contest that the police initially had reasonable suspicion to make a valid investigatory stop of defendant pursuant to Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Rather, defendant asserts that he was subjected to an unlawful arrest or a prolonged detention when the police officers handcuffed him and placed him in the back of a squad car prior to searching Thomas's vehicle. Defendant notes that up until that point, the police had verified defendant's identification, questioned defendant regarding his reason for being in the area, confirmed that there were no outstanding warrants for defendant's arrest, determined that there was nothing illegal on defendant's person, and had not witnessed any suspicious behavior on the part of defendant. Defendant asserts further that the search of Thomas's vehicle, the recovery of the gun, and the taking of defendant's statements were all "fruits" of the illegal seizure of defendant and should have been suppressed. Defendant contends that the trial court's analysis regarding defendant's standing to contest a search of Thomas's vehicle misses the point of defendant's legal argument, that the search of the vehicle and the finding of the gun were "fruits" of an illegal seizure of defendant's person and that standing to contest a search of

9

the vehicle, therefore, was irrelevant. In the alternative, defendant contends that even if the trial court's standing analysis was correct, defendant's statements to police still should have been suppressed as a "fruit" of the illegal seizure of defendant.

The State argues that the trial court's rulings denying defendant's motions to suppress are correct and should be affirmed. Specifically, the State asserts that defendant lacks a reasonable expectation of privacy in Thomas's vehicle and cannot, therefore, challenge a search of the vehicle. The State asserts further that defendant's arrest and subsequent statements are a proper result of the probable cause that arose from the finding of the gun in the passenger area of Thomas's vehicle. In the alternative, the State asserts first that the prolonged detention of defendant and the search of the vehicle for weapons were proper under Terry, and second, that even if the detention of defendant was improperly prolonged, the finding and confronting of defendant with the gun that was properly recovered from Thomas's vehicle attenuated the taint of the improper prolonged detention.

A reviewing court applies a two-part standard of review to a trial court's ruling on a motion to suppress evidence. Ornelas v. United States, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996); People v. Luedemann, 222 Ill. 2d 530, 542, 857 N.E.2d 187, 195 (2006). The trial court's findings of fact are given great deference and will not be reversed on appeal unless they are against the manifest weight of the evidence. Luedemann, 222 Ill. 2d at 542, 857 N.E.2d at 195. A deferential standard of review applies to the trial court's findings of fact because the trial court has the opportunity to observe the demeanor and testimony of the witnesses firsthand and, thus, is in a better position than the reviewing court to judge the witnesses' credibility, to determine the weight to be given to testimony, to decide the inferences to be drawn from the evidence, and to resolve any conflicts in the evidence. See People v. Jones, 215 Ill. 2d 261, 268, 830 N.E.2d 541, 548

(2005); People v. Frazier, 248 Ill. App. 3d 6, 13, 617 N.E.2d 826, 832 (1993). However, as to the trial court's ultimate legal ruling of whether reasonable suspicion or probable cause exists and whether suppression is warranted, de novo review applies. Luedemann, 222 Ill. 2d at 542-43, 857 N.E.2d at 195-96; People v. Sorenson, 196 Ill. 2d 425, 431, 752 N.E.2d 1078, 1083 (2001). The reviewing court is free to make its own assessment of those legal issues, based upon the findings of fact, and to draw its own conclusions. See Luedemann, 222 Ill. 2d at 542, 857 N.E.2d at 195.

In the present case, we need only address whether the search of Thomas's vehicle was a proper limited protective search under Terry, since that determination is dispositive of the issue before this court. The fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution, provide protection against unreasonable searches and seizures.[1] U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6; People v. Pitman, 211 Ill. 2d 502, 513, 813 N.E.2d 93, 101 (2004). One type of police-citizen encounter that does not constitute an unreasonable seizure is a brief investigative detention or Terry stop. Luedemann, 222 Ill. 2d at 544, 857 N.E.2d at 196. Pursuant to Terry and Illinois law, an officer may, without violating the fourth amendment, conduct a brief investigatory stop or detention of an individual when the officer has reasonable suspicion, based on specific articulable facts and the reasonable inferences to be drawn therefrom, to believe that the individual has committed or is about to commit a crime. Terry, 392 U.S. at 20-23, 20 L. Ed. 2d at 905-07, 88 S. Ct. at 1879-81; 725 ILCS 5/107–14 (West 2006).

An officer making a proper investigatory stop may conduct a limited protective search or frisk

---

[1]For the most part, the search and seizure provision of the Illinois Constitution has been interpreted in a manner that is consistent with the rulings of the United States Supreme Court on fourth amendment issues. Thus, we will only refer to the fourth amendment throughout the remainder of this appeal.

of the individual's outer clothing for weapons if the officer reasonably believes that the individual is armed and presently dangerous to the officer or others. Terry, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883; Sorenson, 196 Ill. 2d at 432, 752 N.E.2d at 1084; 725 ILCS 5/108–1.01 (West 2006). The purpose of a limited protective search is to protect the officer's safety and the safety of others in the area, not to gather evidence of a crime. Sorenson, 196 Ill. 2d at 432, 752 N.E.2d at 1084. If a protective search exceeds that purpose, it is no longer justifiable and anything recovered beyond that point will be suppressed as a "fruit" of the illegal search. Sorenson, 196 Ill. 2d at 432, 752 N.E.2d at 1084. The test for whether a protective search is proper is an objective one: would a reasonably prudent person under the circumstances believe that his safety or the safety of others is in danger. Sorenson, 196 Ill. 2d at 433, 752 N.E.2d at 1084.

In Michigan v. Long, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983), the United State's Supreme Court extended the Terry protective search rule to allow a protective search of a passenger compartment of a vehicle when the officer reasonably believed that the occupant was dangerous and could gain immediate control of a weapon. See Long, 463 U.S. at 1049, 77 L. Ed. 2d at 1220, 103 S. Ct. at 3481. In so doing, the supreme court noted that the justification for a protective search of a vehicle is not taken away merely because the police officer currently has the suspect's movement under control. See Long, 463 U.S. at 1051-52, 77 L. Ed. 2d at 1221-22, 103 S. Ct. at 3482. A Terry stop places an officer in close range to a suspect, without the protections that are normally available when a suspect is under full custodial arrest. Long, 463 U.S. at 1052, 77 L. Ed. 2d at 1221-22, 103 S. Ct. at 3482. A suspect may try to retrieve a weapon from his clothing or try to break away from the police officer's control and retrieve a weapon from his vehicle. Long, 463 U.S. at 1051, 77 L. Ed. 2d at 1221, 103 S. Ct. at 3482. In addition, if the suspect is not arrested, he

may return to his vehicle and may gain access to any weapon located inside. Long, 463 U.S. at 1051-52, 77 L. Ed. 2d at 1221, 103 S. Ct. at 3482. Under those circumstances, an officer will be allowed to take reasonable steps to protect his or her safety and the safety of others. See Long, 463 U.S. at 1052 n.16, 77 L. Ed. 2d at 1222 n.16, 103 S. Ct. at 3482 n.16. As with all protective searches allowed under Terry, a protective search of a passenger compartment of a vehicle is limited to those areas where a weapon could be placed or hidden. Long, 463 U.S. at 1052 n.16, 77 L. Ed. 2d at 1222 n.16, 103 S. Ct. at 3482 n.16.

In the present case, defendant concedes, and we agree, that the police officers had reasonable suspicion to conduct a brief Terry stop of defendant.[2] See People v. Lee, 48 Ill. 2d 272, 276-77, 269 N.E. 2d 488, 491 (1971) (officers had reasonable suspicion to make a Terry stop on defendants where officers learned previously of a possible gang war in their patrol area, heard shots in that area at about 9:30 p.m., saw defendants and three other young men about two minutes later walking on a sidewalk about two blocks away from where the shots were heard, saw no one else in the vicinity, and saw that four of the young men were wearing the type of headgear worn by the gang that was possibly involved in the anticipated gang war); People v. Basiak, 50 Ill. App. 3d 155, 157-58, 365 N.E.2d 570, 572 (1977) (officers had reasonable suspicion to make a Terry stop on defendant where officers heard a gunshot come from around the corner of their current location, immediately saw defendant and his companion in that area, and saw no other vehicles or persons in that area at that time). Thus, the narrow question before this court is whether a police officer, who has reasonable suspicion to believe

_____

[2]For the purposes of this appeal, we need not determine when exactly during the encounter defendant was detained. Suffice it to say, at some point during the encounter, the interaction between defendant and the police officers rose to the level of a detention or stop pursuant to Terry.

13

that an individual was involved in a shooting that has just occurred, may conduct a limited protective search of the passenger compartment of a vehicle that the officer has just seen the individual get out of. We find that under those circumstances, consistent with Terry and Illinois law, a limited protective search of the passenger compartment of the vehicle for weapons is proper. See Long, 463 U.S. at 1049, 77 L. Ed. 2d at 1220, 103 S. Ct. at 3481; Sorenson, 196 Ill. 2d at 439-41, 752 N.E.2d at 1088-89; People v. Starks, 190 Ill. App. 3d 503, 509, 546 N.E.2d 71, 76 (1989). Thus, we rule that the search of Thomas's vehicle was a proper protective search under Terry and that the trial court was correct in denying defendant's motion to suppress the gun. No evidence has been presented to suggest that the search of the vehicle that was conducted in this case exceeded the scope of a limited protective search.

We reject defendant's argument that the search was the result of an illegal seizure. Defendant concedes that the initial detention was proper, and we do not agree with defendant's assertion that, at some point prior to the search, defendant should have been released. Although brief in nature, a Terry stop may last for a reasonable duration while the officer involved attempts to dispel or confirm his suspicions. See Starks, 190 Ill. App. 3d at 509, 546 N.E.2d at 76. This case involved a confirmed report of a shooting that had just occurred about two houses down from where defendant was first seen. The testimony of Officer Hanley and Lieutenant Adams established that defendant and Thomas were the only people out in the area at that time (just after 3 a.m.), that none of the businesses in the area were open, that defendant and Thomas had given vague responses to Officer Hanley's questions, and that defendant and Thomas had seemed nervous about the entire encounter. Defendant presented no evidence to rebut or contradict the testimony on those matters. At the time that Officer Hanley searched the vehicle, although he had confirmed defendant's identification and had determined that

14

there were no warrants for defendant's arrest or anything illegal on defendant's person, he had not yet dispelled or confirmed his suspicions on whether defendant was involved in the shooting. Therefore, Hanley could briefly detain defendant longer in attempt to dispel or confirm those suspicions, as long as the period of detention was not unreasonable. See Starks, 190 Ill. App. 3d at 509, 546 N.E.2d at 76. We note that in the trial court, defendant presented no evidence whatsoever regarding the duration of defendant's encounter with the police from the time that Officer Hanley spoke to defendant in the parking lot until the time that the vehicle was searched. Thus, we can draw no conclusion as to whether this stop was a lengthy one or of an unreasonable duration.

Nor do we find that the proper Terry stop conducted in this case was elevated to an illegal arrest when the officers handcuffed defendant before they searched Thomas's vehicle. Handcuffing of a suspect, alone, may not convert a Terry stop into an arrest, depending on the circumstances. See People v. Waddell, 190 Ill. App. 3d 914, 926-28, 546 N.E.2d 1068, 1075-76 (1989) (Terry stop lasting 15 to 20 minutes of defendant suspected of being involved in possession of drugs was not converted into an arrest where seven officers participated in the stop of defendant's vehicle, asked the occupants to exit the vehicle, handcuffed and pat-searched defendant, and secured defendant in a squad car while conducting a search of the vehicle pursuant to defendant's consent); Starks, 190 Ill. App. 3d at 508-10, 546 N.E.2d at 75-77 (Terry stop lasting 10 minutes of defendant suspected of committing armed robbery was not converted into an arrest where police officers stopped the vehicle defendant was riding in, ordered defendant and the other occupants of the vehicle out of the vehicle at gunpoint, handcuffed defendant and the other occupants of the vehicle, and searched the passenger compartment of the vehicle for weapons). It would make no sense under the law to grant an officer the authority to properly detain an individual pursuant to an investigatory stop and yet deny

the officer the use of force necessary to carry out that detention in a safe and effective manner. See People v. Roberts, 96 Ill. App. 3d 930, 934, 422 N.E.2d 154, 157 (1981); Starks, 190 Ill. App. 3d at 509, 546 N.E.2d at 76. "The real difference between an investigatory stop and an arrest lies in the length of time the suspect is detained and the scope of the investigation which follows the initial stop. [Citation.] The general rule is that the officer's suspicions must be allayed in a reasonable time; if they are not, the officer must allow the person to leave or make a full arrest." Starks, 190 Ill. App. 3d at 509, 546 N.E.2d at 76.

Here, as noted above, defendant presented no evidence in the trial court to establish the length of the particular police-citizen encounter in the present case. Thus, based on the lack of that information and the other facts contained in the record, we can only conclude that the investigatory stop of defendant was not unreasonable and did not rise to the level of an arrest when defendant was handcuffed and placed in the back of the squad car. The search of Thomas's vehicle for weapons was proper under Terry based on the facts of this case. Once Officer Hanley found the gun under the passenger area of the vehicle, he had probable cause to arrest defendant, whom he had seen riding in that area of the vehicle only a few moments earlier. See People v. Gherna, 203 Ill. 2d 165, 176, 784 N.E.2d 799, 806 (2003) (probable cause exists when the facts and circumstances known to the arresting officer are sufficient to cause a reasonable person to believe that the arrested individual has committed an offense).

Having reached that conclusion, we need not rule upon whether defendant has standing to contest a search of Thomas's vehicle since even if defendant has standing to contest the search, we have already determined that the detention of defendant, the search of the vehicle, and the subsequent arrest all were proper. It follows, therefore, that the gun and defendant's statements to police were

16

not the product of an illegal seizure of defendant. Therefore, defendant's motion to suppress the gun and his motion to suppress his statements to police were properly denied.

As his final point of contention on appeal, defendant argues, and the State concedes, that defendant's convictions for unlawful possession of a weapon by a felon (UPWF) and aggravated unlawful use of a weapon (AUUW) are both premised upon the same physical act and cannot both stand under one-act, one-crime principles. The parties disagree, however, as to which conviction should be vacated. Defendant asserts that UPWF is the more serious offense, despite its lower felony classification, because it is subject to a higher maximum prison term. Defendant submits, therefore, that his conviction for AUUW, as the less serious offense, should be vacated under one-act, one-crime principles. The State asserts that AUUW is the more serious offense in this case because it has a higher felony classification, a Class 2 felony as opposed to a Class 3 felony; has a higher minimum sentence, three years as opposed to two; and has a higher period of mandatory supervised release, two years as opposed to one. The State submits, therefore, that defendant's conviction for UPWF, as the less serious offense, should be vacated under one-act, one-crime principles.

The application of the one-act, one-crime rule is a question of law subject to de novo review on appeal. People v. Boyd, 307 Ill. App. 3d 991, 998, 719 N.E.2d 306, 311 (1999). It is well settled that a defendant may not be convicted of multiple offenses that are based upon precisely the same single physical act. People v. King, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45 (1977); People v. Rodriguez, 169 Ill. 2d 183, 186, 661 N.E.2d 305, 306 (1996). When a defendant is convicted of two offenses based upon the same single physical act, the court must vacate the less serious offense. People v. Lee, 213 Ill. 2d 218, 226-27, 821 N.E.2d 307, 312 (2004). The relative seriousness of all offenses is determined by the legislature. Lee, 213 Ill. 2d at 228, 821 N.E.2d at 313. To determine

17

which of two offenses is the less serious, a court must consider the intent of the legislature as expressed in the plain language of the statutes involved. Lee, 213 Ill. 2d at 227, 821 N.E.2d at 312. As our supreme court expressed in Lee, common sense indicates that the legislature will provide a greater punishment for the crime it deems to be more serious. Lee, 213 Ill. 2d at 228, 821 N.E.2d at 313.

We start our analysis of this issue with the statutes in question. As to AUUW, section 24–1.6 of the Criminal Code of 1961 (the Code) provides in pertinent part that a violation of the statute "by a person who has been previously convicted of a felony in this State or another jurisdiction is a Class 2 felony for which the person shall be sentenced to a term of imprisonment of not less than 3 years and not more than 7 years." 720 ILCS 5/24–1.6(d) (West 2006). Section 24–1.1 of the Code, as to UPWF, provides in pertinent part that "[v]iolation of this [s]ection by a person not confined in a penal institution shall be a Class 3 felony for which the person, if sentenced to a term of imprisonment, shall be sentenced to no less than 2 years and no more than 10 years." 720 ILCS 5/24–1.1(e) (West 2006). As a Class 2 felony, AUUW as charged in this case is subject to a mandatory supervised release (MSR) term of two years. 730 ILCS 5/5–8–1(d)(2) (West 2006). Whereas, UPWF as charged as a Class 3 felony in this case is subject to a MSR term of one year. 730 ILCS 5/5–8–1(d)(3) (West 2006).

Having considered all of the above in the present case, we conclude that UPWF, as charged in this case, is the less serious offense and should be vacated.[3] UPWF was given a lower felony classification by the legislature, was made a probationable offense by the legislature, and was made

---

[3]All references to AUUW and UPWF shall be to those offenses as they were charged in this case.

18

subject to a shorter period of MSR by the legislature's classification of it as a Class 3 felony. See 720 ILCS 5/24–1.1(e) (West 2006); 730 ILCS 5/5–8–1(d) (West 2006). By contrast, AUUW was given a higher felony classification by the legislature, was made a nonprobationable offense, was given a higher minimum sentence of imprisonment, and was made subject to a longer period of MSR. 720 ILCS 5/24–1.6(d) (West 2006); 730 ILCS 5/5–8–1(d) (West 2006). Since both of the offenses involved arise from the commission of the same single physical act, defendant's conviction and sentence for the less serious offense, UPWF, must be vacated. See Lee, 213 Ill. 2d at 226-27, 821 N.E.2d at 312.

We recognize that our conclusion on this issue is contrary to the recent decision of the First District Appellate Court in People v. Martinez, No. 1–06–1482 (October 31, 2008). We do not dispute that the decision in Martinez involves the same exact offenses as those involved in the present case and that Martinez is directly on point with the issue presented here. See Martinez, slip op. at 19. We do not agree, however, with the conclusion reached in Martinez and note that no analysis is presented to support the appellate court's conclusion in that case. See Martinez, slip op. at 19.

We also recognize that our conclusion is arguably contrary to portions of the analysis adopted by the Second District Appellate Court in People v. Gancarz, 369 Ill. App. 3d 154, 859 N.E.2d 1127 (2006), aff'd in part & rev'd in part on other grounds, 228 Ill. 2d 312, 888 N.E.2d 48 (2008). In that case, which involved different offenses than what we are faced with here, the appellate court found that the felony with the lower classification was actually the more serious offense. See Gancarz, 369 Ill. App. 3d at 179-80, 859 N.E.2d at 1151. In reaching that conclusion, the appellate court cited the commonsense rule from Lee, which stresses the importance of focusing on the potential punishment available for each crime in determining which crime is the more serious offense. See Gancarz, 369

19

Ill. App. 3d at 180, 859 N.E.2d at 1151, citing Lee, 213 Ill. 2d at 228, 820 N.E.2d at 313. After setting forth the rule in Lee, the appellate court in Gancarz added its own interpretation to that rule, stating that the focus of the inquiry should be on the maximum sentence available for each offense, not the classification attached. See Gancarz, 369 Ill. App. 3d at 180, 859 N.E.2d at 1151. No authority is provided in support of that statement. See Gancarz, 369 Ill. App. 3d at 180, 859 N.E.2d at 1151. We do not agree with that statement in Gancarz and believe that it deviates from the rule set forth in Lee. We note that in Lee, the felony that was subjected to a higher level of punishment and was determined to be the more serious offense was also the felony with the higher classification level. See Lee, 213 Ill. 2d at 228, 821 N.E.2d at 313.

Ultimately, a court facing this issue must determine from the legislative intent which offense the legislature deemed to be more serious. See Lee, 213 Ill. 2d at 227-28, 821 N.E.2d at 312-13. In our opinion, the clearest indication of the legislature's intent regarding the seriousness of the offense is the classification level assigned to the offense by the legislature. This is not a deviation from the commonsense rule set forth in Lee since, generally speaking, each higher level of offense has a higher sentencing range attached to it. See 730 ILCS 5/5–8–1 (West 2006). A court, obviously, will have to go beyond that point when the two offenses involved in the inquiry have the same classification level. Under such circumstances, a court should carefully consider all indications of the legislature's intent, not merely the portion of the statute that sets forth the maximum term of imprisonment. Such factors as the minimum and maximum sentences available and whether the offense is probationable or nonprobationable should be considered. See Town & Country Utilities, Inc. v. Illinois Pollution Control Board, 225 Ill. 2d 103, 117, 866 N.E.2d 227, 235 (2007) (in interpreting a statute, the words and phrases of a statute should not be construed in isolation, but

20

rather, should be interpreted in light of all of the other relevant provisions of the statute).

For the foregoing reasons, we affirm the judgments of the circuit court of Peoria County denying defendant's motion to suppress the gun and denying defendant's motion to suppress his statements to police. We vacate defendant's conviction and sentence for unlawful possession of a weapon by a felon and remand this case to the circuit court to amend the sentencing order to reflect that the conviction and sentence for unlawful possession of a weapon by a felon have been vacated.

Affirmed in part and vacated in part; case remanded with directions.

WRIGHT, J. concurring.

JUSTICE SCHMIDT, specially concurring:

I concur in the judgment.