# Illinois Official Reports

## Appellate Court

---

### *People v. Webb*, 2020 IL App (1st) 180110

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. COREY WEBB, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-18-0110 |
| Filed | June 1, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-1705001; the Hon. Thomas R. Davy and the Hon. Williams B. Raines, Judges, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | Catharine D. O'Daniel, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GRIFFIN delivered the judgment of the court, with opinion.<br>Justice Pierce concurred in the judgment and opinion.<br>Justice Hyman dissented, with opinion. |

# OPINION

¶ 1    Following a jury trial, defendant was found guilty of unlawful possession of a weapon by a street gang member and aggravated unlawful use of a weapon. He appeals those convictions, arguing that the trial court erred when it denied his motion to quash arrest and suppress evidence, that the State did not prove that he was a member of a street gang, and that the trial court erred when it limited the trial testimony about the Independent Police Review Authority's investigation surrounding defendant's arrest. We hold that the trial court did not err when it denied defendant's motion to quash arrest and suppress evidence and did not abuse its discretion when it limited the scope of the testimony about the investigation into the police officers' conduct in making the arrest. We, however, hold that the evidence was insufficient to prove defendant's membership in a street gang. Accordingly, we affirm in part, reverse in part, and remand for resentencing.

¶ 2                                    I. BACKGROUND

¶ 3    On September 10, 2010, at approximately 11:30 p.m., Chicago police officers were on patrol when they saw a large gathering of 30 to 40 people gathered in the street and on the sidewalk making a lot of noise. Officer Dennis Huberts and his partner arrived at the scene on the east side of the crowd, and two other officers arrived at the scene on the opposite side of the crowd. The four officers exited their vehicles with plans to disperse the crowd with the officers converging on the crowd from different directions.

¶ 4    The crowd was beginning to disperse, primarily toward the north and the west, when Officer Huberts saw defendant begin running eastward toward him and his partner. Officer Huberts observed defendant looking over his shoulder at the other set of police officers as he fled. Officer Huberts also saw that defendant was clutching something near his waistband as he was running. Officer Huberts announced his office and told defendant to stop. Defendant did not comply.

¶ 5    Officer Huberts chased defendant and put his hands on defendant's shoulders to try to stop him. Defendant continued to run and pull away from Officer Huberts, so Officer Huberts performed an "emergency takedown," grabbing defendant near his collar area and pulling him to the ground. While on the ground, defendant was resisting Officer Huberts's attempts to detain him, and defendant continued to stiffen his body and would not remove his hands from his waist area while Officer Huberts attempted to gain control over defendant on the ground. Officer Huberts struck defendant in the head multiple times in an attempt to secure defendant's compliance. After striking defendant, Officer Huberts and his partner were able to get control of defendant's arms and hands, and Officer Huberts went to the area that defendant had been holding and felt a weapon in defendant's waistband. Once defendant's hands were under control of the officers, Officer Huberts went and retrieved a Desert Eagle 9-millimeter handgun from the center of defendant's waistband. The officers then handcuffed defendant. All of the events took place in a matter of seconds.

¶ 6    Defendant was arrested and eventually charged with unlawful possession of a weapon by a street gang member and aggravated unlawful use of a weapon. While at the police station, defendant told the officers that he is a member of the Black P. Stones and that he had been a member of that gang for as long as he could remember. Defendant further stated that he got the gun from one of his fellow gang members. An assistant state's attorney memorialized

defendant's statement and authorized the charges against him. After being at the police station for a period, defendant was transported by ambulance to the hospital. He underwent surgery for a broken jaw.

¶ 7    As the case against defendant progressed, defendant filed a motion to quash arrest and suppress evidence. In that motion, defendant argued that he was doing nothing wrong or illegal before the police officers ran up to him and threw him on the ground. Defendant stated that the officers began to punch and kick him and that they then searched him. He argued that any statement he allegedly made or any evidence uncovered during the search should be suppressed as being the product of an unlawful search and seizure. The trial court denied defendant's motion.

¶ 8    At trial, the police officers' testimony was consistent with the narrative set forth above. However, defendant himself and two other eyewitnesses testified in defendant's defense. All three of these witnesses testified that the officers essentially targeted defendant and searched him for no reason. These witnesses also testified that the officers treated defendant harshly, including that they kicked him in the face, resulting in defendant ending up on the ground, spitting up blood. These witnesses testified that defendant was doing nothing wrong and that the officers just came at him for no reason. They testified that defendant did not have a weapon.

¶ 9    The jury found defendant guilty of both unlawful possession of a weapon by a street gang member and aggravated unlawful use of a weapon. The trial court sentenced defendant to five years' imprisonment. He now appeals his convictions.

¶ 10                                    II. ANALYSIS

¶ 11    Defendant argues that (1) his motion to quash arrest and suppress evidence should have been granted, (2) the evidence was insufficient to prove that the Black P. Stones meet the statutory definition of a "streetgang," (3) the trial court erred when it denied his motion for a directed finding as to whether there was sufficient evidence that the Black P. Stones met the statutory definition of a streetgang, and (4) the trial court improperly limited the testimony about the Independent Police Review Authority's investigation launched into the circumstances surrounding defendant's arrest, namely that the officers used excessive force in arresting defendant. We agree with defendant on points two and three and we reject his arguments on points one and four.

¶ 12                    A. Motion to Quash Arrest and Suppress Evidence

¶ 13    Defendant argues that the trial court erred when it denied his motion to quash arrest and suppress evidence. Defendant contends that his fourth amendment rights were violated where the officers on scene did not see him do anything illegal or improper before they violently detained him. Under the circumstances, defendant maintains that when he was tackled and restrained by the officers it constituted an impermissible arrest, not a lawful *Terry* stop, because the officers restrained him with physical force before they had made any observations that could constitute probable cause or even a reasonable suspicion of criminal activity.

¶ 14    Before a police officer may arrest an individual, the officer must have probable cause that the person committed or is committing a crime. *People v. Sledge*, 92 Ill. App. 3d 1051, 1058 (1981). In contrast, a police officer may briefly detain an individual and perform a protective

pat down when the officer has a reasonable suspicion that the individual is engaged in criminal activity and for purposes of officer safety. *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968).

¶ 15    Officer Huberts testified that he saw defendant running from the crowd and clutching his waistband. Defendant was running toward Officer Huberts and his partner. Officer Huberts believed that the manner in which defendant was grabbing near his waistband was indicative of defendant having a gun concealed in that area. The officers' testimony portrayed the scene as somewhat chaotic, with a large group of individuals creating a noise disturbance and then scattering to disperse when the police arrived. The officers encountered defendant in a high-crime area at approximately 11:30 at night. Defendant fled from one set of officers, but that meant that he was running *toward* Officer Huberts and his partner while he was fixated on his waistband, leading the officers to suspect that defendant was armed while running in their direction. The officers reasonably perceived an officer safety issue.

¶ 16    The officers had a reasonable suspicion that defendant was engaged in criminal activity when he ran from the crowd, grabbing near his waist, in a manner that suggested he was carrying a weapon. The officers provided, both at trial and at the hearing on the motion to suppress evidence, a reasonable basis upon which they believed defendant was armed. Defendant was acting far different than the others in the crowd that were dispersing, and his nervous and evasive behavior culminated in flight. In the officers' experience, defendant's fixation on his waistband area in a manner suggesting he had a weapon concealed there as he fled indicated that he was armed. The officers in this case had seen dozens of people carrying weapons in the past who conducted themselves as defendant did here. See *Terry*, 392 U.S. at 27 ("in determining whether the officer acted reasonably in such circumstances, due weight must be given *** to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience").

¶ 17    When the officers attempted to detain defendant in furtherance of the above-established reasonable suspicion of criminal activity, defendant resisted their attempts to effectuate a *Terry* stop. He continued to run from Officer Huberts after Officer Huberts announced his office and told defendant to stop. Then, when Officer Huberts put his hands on defendant's shoulders to try to stop him, defendant tried to pull away. It was at that point that Officer Huberts elevated the level of force, by tackling defendant, to a level that would ordinarily only be permissible for an arrest.

¶ 18    There are two inferences that can be drawn regarding the reason that defendant was grabbing near his waist. One, that he was wearing baggy pants and was grabbing near his waist to hold up his pants as he ran or, two, that he was grabbing near his waist because he had a firearm concealed there. Our standard of review requires us to draw that inference in the State's favor. Moreover, there is no statement anywhere in the record that defendant was grabbing in his waist area to keep his pants from falling down as he ran. To the contrary, defendant and the witnesses who testified on his behalf testified that he never even ran from the police. The jury disbelieved them. Any leap to the idea that defendant could have been holding his pants up to stop them from falling down is in derogation of our role on appeal and is not supported by the evidence in any way.

¶ 19    Before the police have acquired a reasonable suspicion of criminal activity, an individual has the right to avoid an encounter with police. *People v. Timmsen*, 2016 IL 118181, ¶ 10. However, when officers have acquired a reasonable suspicion of criminal activity and attempt to detain a suspect under *Terry*, that suspect is no longer free to leave or voluntarily terminate

an encounter with the police. *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 60 (under *Terry*, a police officer is specifically permitted to briefly detain an individual to investigate the possibility of criminal behavior absent probable cause, and during the course of a *Terry* stop, a person is "no more free to leave than if he were placed under a full arrest" (internal quotation marks omitted)). A defendant is required to submit to the *Terry* stop, so long as it is lawful at its inception, *i.e.*, that the officers indeed had a reasonable suspicion of criminal activity sufficient to support the brief detention at its outset. If a defendant fails to submit to a lawful attempt at effectuating a *Terry* stop, the officers have the right to take steps to force compliance with their directives in order to effectuate a *Terry* investigative stop in a safe and effective manner. See *People v. Johnson*, 387 Ill. App. 3d 780, 791 (2009); *People v. Eyler*, 2019 IL App (4th) 170064, ¶ 23.

¶ 20    Here, when Officer Huberts had acquired a level of knowledge sufficient to constitute a reasonable suspicion of criminal activity, he told defendant to stop, but defendant did not heed the instructions. Instead, defendant continued his flight. A person is not seized for purposes of the fourth amendment when the person does not yield to the officer's show of authority. *California v. Hodari D.*, 499 U.S. 621, 625-26 (1991). When Officer Huberts tried to force defendant to stop by putting his hands on defendant's shoulders, defendant still refused to submit to the officer's then-legal authority to force compliance. Because of defendant's continued noncompliance, Officer Huberts was entitled to take further steps to detain defendant involuntarily. While an officer would surely not have authority to tackle an individual that was submitting to a *Terry* stop as directed, defendant's refusal to submit to a lawful *Terry* stop made the circumstances such that Officer Huberts was entitled to take steps to force defendant's compliance with the officers' commands. The officers had reasonable suspicion of criminal activity to support a *Terry* stop, and when defendant failed to comply, the officer's actions in tackling defendant and restraining him did not violate his fourth amendment rights.[1] The trial court did not err when it denied defendant's motion to quash arrest and suppress evidence.

¶ 21                    B. Sufficiency of the Evidence as to Defendant's
                              Membership in a Street Gang

¶ 22    Defendant argues that the evidence was insufficient to support a conviction for unlawful possession of a firearm by a street gang member because the State failed to prove the essential elements of that offense beyond a reasonable doubt. The fourteenth amendment to the United States Constitution requires that the government prove each element of a crime beyond a reasonable doubt before a person may be convicted of a crime. *In re Winship*, 397 U.S. 358, 363-64 (1970). On appeal, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). While we give great deference to a fact finder when we review for the sufficiency of the evidence, our constitutional responsibility requires that we scrutinize the evidence and

---

[1]After this case was set for oral argument, defendant filed a motion seeking leave to cite additional authority. In particular, defendant referred us to our decision in *People v. Horton*, 2019 IL App (1st) 142019-B, and asked us to consider that opinion in resolving this appeal. We granted defendant leave to cite the additional authority and have taken *Horton* into account in arriving at this decision.

determine whether the State proved enough at trial to meet its constitutional burden. *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000).

¶ 23    To prove that a defendant committed the offense of unlawful possession of a firearm by a street gang member, the State must prove that the defendant knowingly possessed a firearm in public and without a valid Firearm Owner's Identification Card and that he is a member of a street gang. 720 ILCS 5/24-1.8(a)(1) (West 2010). For purposes of that offense, "streetgang" or "gang" has the meaning ascribed to it in section 10 of the Illinois Streetgang Terrorism Omnibus Prevention Act (740 ILCS 147/10 (West 2010)). The Illinois Streetgang Terrorism Omnibus Prevention Act defines "streetgang" as "any combination, confederation, alliance, network, conspiracy, understanding, or other similar conjoining, in law or in fact, of 3 or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity." 740 ILCS 147/10 (West 2010).

¶ 24    Defendant contends that the State failed to prove at his trial that the Black P. Stones is a "streetgang" under the requisite definition. Defendant moved for a directed finding on this issue at the close of the State's case-in-chief and he argues on appeal that his motion should have been granted. The parties both refer us to *People v. Murray*, 2019 IL 123289, ¶¶ 36, 51,[2] in which the Illinois Supreme Court addressed the applicable statutes and held that the State was required to introduce specific evidence about the course or pattern of criminal activity to prove that the defendant was a member of a street gang.

¶ 25    The State concedes that the outcome in this case is controlled by *Murray*. Accordingly, the State acknowledges that we should grant defendant the same relief the supreme court granted in that case: reversing defendant's conviction for unlawful possession of a firearm by a street gang member. See *Murray*, 2019 IL 123289, ¶ 53. We agree that the proper result is a reversal of defendant's conviction for unlawful possession of a firearm by a street gang member.

¶ 26                    C. Admissibility of Evidence Concerning the Independent
                        Police Review Authority Investigation

¶ 27    Defendant argues that the trial court erred when it granted the State's motion *in limine* prohibiting defendant from eliciting testimony about an Independent Police Review Authority (IPRA) investigation into the circumstances surrounding defendant's arrest. Defendant contends that the trial court's limitation on trial testimony about the IPRA investigation infringed on his constitutional right to confront the witnesses against him. Defendant argues that evidence about the IPRA investigation was relevant to his defense and that it should have been admitted for the purpose of showing the officers' bias as well as their motive to testify falsely at trial.

¶ 28    In ruling on the State's motion *in limine* to forbid defendant from introducing evidence about the IPRA investigation, the trial court ruled that defendant was entitled to introduce all the evidence that made up the substance of the IPRA investigation but that he could not elicit testimony about the fact that an IPRA investigation had, in fact, been conducted. Defendant really raises two separate arguments concerning the IPRA investigation. First, he argues that the trial court incorrectly ruled on the State's motion *in limine* on the issue. Second, defendant argues that while his counsel was cross-examining the officers about the arrest, the trial court

---

[2]At the time defendant filed his brief, the Illinois Supreme Court had not yet filed the opinion in *Murray*. However, before the State filed its response brief, the supreme court had decided the case.

improperly sustained objections in which his counsel intended to impeach the officers by using their testimony from the IPRA hearing.

¶ 29 The trial court did not abuse its discretion by limiting evidence about the IPRA investigation in the manner in which it did. Defendant was fully entitled to and did introduce evidence about the circumstances surrounding the detention and arrest, including that he suffered a broken jaw and required surgery. Defendant was permitted to elicit testimony to support his contention that the officers used excessive force, and defendant was able to present his defense that the gun was planted by the officers. Defendant testified in his own defense on the substance of these matters as well. All that defendant was prohibited from exploring at trial was the fact that an IPRA investigation had taken place. The trial court even ruled that defendant could elicit evidence that the officers had testified about the events in a certain way at a "prior hearing," just that the defense could not use the term "IPRA." The trial court expressly ruled that defendant could use the officers' testimony from the IPRA hearing for impeachment purposes.

¶ 30 Even though the IPRA investigation was concluded with a favorable ruling for the officers, the trial court was entitled to find in its discretion that testimony about the IPRA case would distract from the actual issue that the jury was present to decide—whether defendant unlawfully possessed a weapon. See *People v. Sykes*, 224 Ill. App. 3d 369, 375 (1991). The trial court indicated that if it were to allow defendant to introduce the fact that and IPRA investigation was opened into the circumstances surrounding defendant's arrest, it would also allow the State to introduce the fact that the investigation was concluded and it was resolved in the officers' favor. Defendant objected to the trial court allowing evidence of the decision in the IPRA case to be introduced at trial. So the trial court crafted an evidentiary ruling that allowed both sides to achieve most of their ends but left both somewhat unsatisfied. The fact that the IPRA investigation had concluded and was resolved favorably for the officers undercuts defendant's contention that the existence of an IPRA investigation would have motivated the officers to testify in a certain way at trial. In the end, defendant was allowed to present, and the jury was allowed to hear, all of the substance from the IPRA investigation; defendant was simply prohibited from referring to the existence of any official investigation. The jury heard about the alleged police misconduct, including about the injury inflicted on defendant and about the officers allegedly fabricating the evidence that defendant was in possession of a gun in order to cover up their own wrongdoing. The trial court did not abuse its discretion in ruling on the motion *in limine* at issue.

¶ 31 A separate issue is defendant's contention that the trial court improperly sustained the State's objections when defendant attempted to impeach the officers with statements that they had made during the IPRA hearing. Defendant argues that the testimony that Officer Huberts gave at the IPRA hearing was inconsistent with the testimony he gave at trial and during the hearing on defendant's motion to suppress evidence, particularly about the timing in which defendant complained about the injury to his jaw that he sustained when the officers detained him.

¶ 32 At trial, Officer Huberts testified that defendant did not complain about being in pain before or during his interrogation or the time at which he made inculpatory statements to the officers. Officer Huberts testified that it was only after defendant made inculpatory statements and had been placed in lockup that the officers noticed he was injured. However, during the IPRA hearing, Officer Huberts testified that defendant stated that his jaw was "messed up" while the

officers were *processing* defendant. Defendant argues that the inconsistency in the timing that Officer Huberts had attested to was relevant and should have been allowed to impeach the officers' trial testimony.

¶ 33 The evidence that defendant argues should have been permitted was the statements he claims that he made to officers about his injury. Defendant is arguing that he should have been able to introduce his own postarrest, out-of-court statements to the officer. A defendant cannot introduce, through another witness, his own prior statements in an attempt to prove the truth of a matter that is the subjects of those statements. *People v. Woods*, 292 Ill. App. 3d 172, 178 (1997); see also *People v. Patterson*, 154 Ill. 2d 414, 452 (1992) (out of court, self-serving statements by an accused are inadmissible hearsay).

¶ 34 Defendant testified at trial and was fully entitled to testify about what he told the officers or to explore the issue about when the officers knew or should have known about his injuries. Defendant was not, however, entitled to introduce, through the officers, statements he allegedly made with the intended purpose being to prove when the officers might have known about his injuries. The prior consistent statements that defendant claims he should have been entitled to introduce to the jury would have had the purpose of improperly bolstering his trial testimony without falling into any hearsay exception. See *People v. House*, 377 Ill. App. 3d 9, 19 (2007) (proof of a prior consistent statement made by a witness is inadmissible hearsay, which may not be used to bolster a witness's testimony). The trial court did not abuse its discretion when it sustained the State's objection to defendant's line of questioning about what defendant said to the officers regarding his injuries. Defendant has failed to demonstrate that the trial court's rulings on these evidentiary issues entitle him to any relief. See *People v. Short*, 2014 IL App (1st) 121262, ¶¶ 102-05.

¶ 35                                    III. CONCLUSION

¶ 36 Accordingly, we affirm in part, reverse in part, and remand for resentencing.

¶ 37 Affirmed in part and reversed in part; cause remanded.

¶ 38 JUSTICE HYMAN, dissenting:

¶ 39 One fact—the officers' order to disperse—sets this case apart. This is not the traditional case arising under *Illinois v. Wardlow*, 528 U.S. 119 (2000), because Webb's flight followed the order to disperse and so was not unprovoked. This doctrinal wrinkle aside, the majority's decision ultimately runs afoul of the fourth amendment's superseding mandate: reasonableness. See *People v. Timmsen*, 2016 IL 118181, ¶ 9 ("touchstone of the fourth amendment is *** reasonableness" (internal quotation marks omitted)). In my view, it is patently unreasonable for police officers to induce flight by ordering a large group to disperse and then rely on that same flight as part of their justification to detain someone. Although fourth amendment doctrine does not have a word for it, in other areas of criminal law, we call it entrapment—to induce someone to do something for which there is no evidence he or she would have otherwise done and to later hold that behavior against them. See 720 ILCS 5/7-12 (West 2018) (defining defense of entrapment). I consider this practice incompatible with basic fourth amendment principles.

¶ 40    Moreover, the majority's reasoning has unworkable practical implications. Confronted with a similar order to leave, what is a person to do? Move too slowly and be accused of disobeying the order? Move too quickly and come under suspicion? The fourth amendment does not require ordinary people to calibrate their behavior to such a minute degree. I respectfully dissent.

¶ 41    As an initial matter, I find it important to make explicit the point at which the officers seized Webb. We must decide that moment because we evaluate only the information the officers had *before* that moment when determining the seizure's lawfulness. *E.g.*, *People v. Close*, 238 Ill. 2d 497, 514 (2010) (Burke, J., dissenting) (first step in determining whether seizure was reasonable is " 'whether the officer's action was justified at its inception' " (quoting *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968))). I read the majority opinion to tacitly find that the officers had conducted a *Terry* stop from the moment they placed hands on Webb. See *supra* ¶ 20 ("putting his hands on [Webb]'s shoulders" was a "lawful *Terry* stop"). The State concedes as much. I would make express what the majority implies: when officers touched Webb, he was seized for the purposes of the fourth amendment and we look only to Webb's behavior before then to determine whether officers had the authority to touch him.

¶ 42    An officer seizes a person for fourth amendment purposes when the officer makes a sufficient show of authority indicating to a reasonable person that compliance is required and the person under suspicion submits to that authority. See *California v. Hodari D.*, 499 U.S. 621, 628-29 (1991). Importantly, Webb's resistance after the officers initially grabbed him did not defeat their initial seizure of him. When *Hodari D.* spoke of compliance with an officer's show of authority, the United States Supreme Court's primary concern was a suspect who completely frees themselves from the officer's control. The court spoke of an arrestee defeating an officer's seizure by "escap[ing]" or "br[eaking] away" and entering a "period of fugitivity." *Id.* at 625. The Illinois Supreme Court has thought of this issue in a similar way—the question is not whether a suspect was cooperative, the question is whether the suspect completely defeats the seizure and interrupts the causal chain between the seizure and discovery of contraband. See *People v. Henderson*, 2013 IL 114040, ¶ 44 ("defendant's flight *** interrupt[ed] the causal connection between" his seizure and the discovery of a gun).

¶ 43    Nothing broke the link between the officers' initial touching of Webb and applying further force that finally brought him under submission. This means that the officers' actions must have been justified at the moment of the initial touching. In other words, Webb's later resistance cannot be used as part of the calculus for determining reasonable suspicion because it took place *after* he had been seized.

¶ 44    And unlike the majority, I disagree that the officers had enough information to justify Webb's seizure. The majority takes Webb's flight coupled with his holding his saggy pants as sufficient ground on which to detain him. I disagree with this analysis on its own terms. We have held a person's flight insufficient to warrant reasonable suspicion of criminal activity. *In re D.L.*, 2018 IL App (1st) 171764, ¶ 28 ("Although [u]nprovoked flight in the face of a potential encounter with police may raise enough suspicion to justify the ensuing pursuit and investigatory stop *** [citation], there is no bright-line rule authorizing the temporary detention of anyone who flees at the mere sight of the police [citation]." (Emphasis and internal quotation marks omitted.)). We also have explained that a defendant putting his hands in the pockets of his saggy pants not to be indicative of criminal activity. *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶ 30 ("Putting something in one's pockets, in this case, one's hands, is not

- 9 -

a hallmark of criminal activity."). I see no reasoned basis on which to distinguish a defendant who puts his hands in his pockets with one who holds up his saggy pants. See *People v. White*, 2020 IL App (1st) 171814, ¶ 37 (Hyman, J., specially concurring) (describing as "unworkable" any *per se* distinction between walking, jogging, or running from police officer).

¶ 45    That said, accepting the suspicion aroused by flight as a given, the officers' order to disperse dramatically alters the analysis. In each case the State cites where flight was a factor in the analysis of reasonable suspicion, including *Wardlow*, the defendant fled from police officers without any evidence of provocation. See *Wardlow*, 528 U.S. at 124-25 ("[h]eadlong flight" when "unprovoked" is the "consummate act of evasion"); see also *People v. Salgado*, 2019 IL App (1st) 171377, ¶ 3 (defendant and companion "immediately broke apart and walked in different directions" on mere sight of a police car); *People v. Johnson*, 2019 IL App (1st) 161104, ¶ 3 (defendant " 'walk[ed] briskly *** as if to avoid' " police officers on mere sight of the officers' SUV in alley). Here, Webb's fleeing was not an "act of evasion" but, rather the opposite, an act of compliance. *Contra Wardlow*, 528 U.S. at 124-25.

¶ 46    I also reject the State's argument that interpreting Webb's flight as compliance with the officers' orders requires probing his "subjective state of mind." We use "commonsense judgments and inferences about human behavior" when determining what constitutes suspicious behavior. *Id.* at 125. Notions of common sense inform us that a group ordered by police to disperse will comply. See *Hodari D.*, 499 U.S. at 627 ("policemen do not [give commands] expecting to be ignored"). It goes without saying that members of the group may disperse at varying speeds. Courts in other jurisdictions have similarly used common sense to acknowledge the risk that "police officers can create reasonable suspicion or even probable cause where there was none by coercively infringing upon the individual's right to be let alone, and waiting for an arguably suspicious reaction." *State v. Young*, 2006 WI 98, ¶ 45, 294 Wis. 2d 1, 717 N.W.2d 729; see also *id.* ¶ 45 n.15 (citing 4 Wayne R. LaFave, Search and Seizure § 9.4(d), at 461-62 (4th ed. 2004), citing *Commonwealth v. Thibeau*, 429 N.E.2d 1009 (Mass. 1981)). The officers' behavior here manifests that risk.

¶ 47    For similar reasons, I would reject one of the trial court's factual findings as against the manifest weight of the evidence. *E.g.*, *People v. Manzo*, 2018 IL 122761, ¶ 25 (reciting standard of review). The trial court found, "someone coming in the officer's direction holding their waistband is certainly justification which would be described as if not bizarre behavior *** certainly behavior that would justify a further inquiry for officer safety." The evidence does not support the trial court's conclusion. Testimony shows that officers came up to the group from all sides. As far as the record reveals, any direction Webb could have gone would have required him to move toward an officer. I do not find Webb's behavior "bizarre" or, under the circumstances, an indication of dangerousness.

¶ 48    Perhaps more important than the trial court's unsupported factual premise is its misstatement of the law. Officers cannot support their decision to *stop* someone based on a belief that the person poses a danger—that is the standard for a frisk, not a stop. See *United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017) (*en banc*) (distinguishing between the requirements for *Terry* stop and a *Terry* frisk (citing *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009))). Only suspicion that a defendant committed, was committing, or was about to commit a *crime* can support a stop. *Id.* The trial court's invocation of the officers' fear for their safety as a reason to stop Webb misapplies fourth amendment law.

¶ 49    Here, that distinction makes a difference. The officers did not suggest that Webb's saggy pants made them suspicious that he was committing a crime, only that he may be armed. Of course, in Illinois, suspicion that a person is armed, without more information, does not constitute suspicion of criminal activity. See *People v. Burns*, 2015 IL 117387, ¶ 32 (finding criminal offense of carrying gun outside home to be facially unconstitutional).

¶ 50    So what is left? It appears to me the officers believed holding up saggy or baggy pants was evidence of criminal activity. But that is not *particularized* suspicion, which the fourth amendment requires. *E.g.*, *People v. Gaytan*, 2015 IL 116223, ¶ 20 ("officers must have 'a *particularized* and objective basis for suspecting the particular person stopped' was violating the law" (emphasis added) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014))). Indeed, it is nothing but a hunch based on a common mode of dress.

¶ 51    I cannot agree that a style choice with a varied history should ever be a basis for suspicion of *criminal* activity. See Gene Demby, *Sagging Pants and the Long History of "Dangerous" Street Fashion*, NPR (Sept. 11, 2014, 8:18 AM), https://www.npr.org/sections/codeswitch/ 2014/09/11/347143588/sagging-pants-and-the-long-history-of-dangerous-street-fashion [https:// perma.cc/9RWE-RD35]. Though not in the record, I worry that saggy pants, a male fashion statement, may be celebrated (see Brooke Bobb, *Could You Love a Man in the Baggy Pants That Took Over the Runways This Season?*, Vogue (Jan. 22, 2019), https://www.vogue.com/ article/fall-2019-menswear-baggy-pants-trend [https://perma.cc/TS5N-TRH5]), yet used as a proxy for suspected criminality. See Shahid Abdul-Karim, *For Some, Sagging Pants Carry Greater Meaning*, Wash. Times (July 13, 2014), https://www.washingtontimes.com/news/ 2014/jul/13/for-some-sagging-pants-carry-greater-meaning    [https://perma.cc/LP99-9FJT] (noting " '[s]kateboarders and hipsters' " can wear saggy pants without attracting ire of police). I acknowledge the officers' experience finding weapons on individuals who grabbed their waist while wearing saggy pants (*supra* ¶ 16), but the officers' suspicion must have been based on facts particularized to Webb. Nothing in the record points to a particularized suspicion— for example, an unusual bulge, a glint of metal, or a report of someone with a gun.

¶ 52    As a final side note, I agree with the majority's decision not to spend much time analyzing *People v. Horton*, 2019 IL App (1st) 142019-B. See *supra* ¶ 20 n.1. It is too different to help: *Horton* did not involve any police directives, let alone an order to disperse.

¶ 53    In sum, the primary fact the officers relied on to detain Webb—his flight toward them— was entirely the result of the officers' own actions. I cannot agree that it is reasonable under the fourth amendment for police officers to essentially trick people into behavior the law considers "suspicious," so I dissent.